Mayor, etc., of Nashville *v.* Edwards.

MAYOR AND CITY COUNCIL OF NASHVILLE *v.* JOHN W. EDWARDS *et al.*

1. CHANCERY PLEADINGS AND PRACTICE. *Co-sureties.* B., as one of the sureties for E., was about to take steps to have himself released, when M. proposed to become his co-surety if he would remain on the bond. M. then signed the original bond. Upon bill filed against B. and M., *held* that M. was not liable on the bond, but was liable upon cross-bill by B. to contribute as co-security from the date he signed the bond.

2. SAME. *Same. Burden of proof.* Upon a bill filed by city against tax collector and sureties, the collector was charged with all assessments and credited with amount paid over, and appeal taken to Supreme Court, and decree reversed because there was other evidence which might be obtained of the amount of the credits, the book of assessments upon which the credits were entered having been lost. Upon another trial no further evidence was offered, and decree rendered, *held* the burden of proof was upon defendants.

FROM DAVIDSON.

Appeal from the Chancery Court at Nashville. THOS. H. MALONE, Sp. Ch.

JOHN RUHM for Nashville.

E. H. EAST for M. Burns.

JOHN LELLYETT for McCann.

COOPER, Sp. J., delivered the opinion of the court.

The original bill in this case was filed August 16, 1880, against John W. Edwards, as water tax-collector of Nashville, and against the various securities upon his several bonds, executed as such collector. The bill seeks to hold Edwards liable for an alleged defalcation in office, and also his sureties, and to apportion the default of Edwards among the respective bonds.

The case was before this court at its last term on an appeal and a writ of error, prosecuted by sureties upon different bonds. The facts of the case were set out at length in a former opinion of this court, to which we refer, and need not now be recited in minute detail. Edwards was first elected such collector in October, 1874, for a term of one year. On October 18, 1875, he was again elected for a term of two years. On October 17, 1877, he was a third time chosen, and for a term of two years, but this term ended January 19, 1879, because the office of water tax-collector was then abolished.

The defendant, M. Burns, and J. M. Elliston became Edwards' sureties for the second term. Elliston has died pending the litigation, and the cause has been revived against his administrator. Before the second term of Edwards expired, Burns, one of his sureties, became dissatisfied, and spoke of taking steps to have himself released as such surety, and thereupon B. W. McCann went to Burns and agreed to become co-surety with him if he, Burns, would remain on the bond. Burns acceded to this proposition, and McCann

Mayor, etc., of Nashville *v.* Edwards.

went and procured the bond, signed his name to it
and handed it back to the official having its custody.
McCann was made a defendant to the original bill
and denied his liability, filing a special plea of *non
est factum,* and then Burns filed a cross-bill against
McCann to compel him to contribute as a co-surety
if he should be adjudged liable as a bondsman of
Edwards. When the case was first tried by the
chancellor, complainant's bill was dismissed as to Mc-
Cann, but it was adjudged on the cross-bill of Burns
that he was entitled to hold McCann as a co-surety
from and after the date when McCann actually signed
the bond, and upon the facts it was adjudged that
McCann signed the bond six months before the ex-
piration of that term of Edwards' office. The decree
of the chancellor in this respect was affirmed at the
last term of this court, as well as on other points.
On some of the points involved, the decree of the
chancellor was reversed, as will appear from an in-
spection of the opinions and decree herein at said term
of this court, and the cause was remanded to the
chancery court to the end that the account be again
taken. The water tax was assessed twice a year,
the assessments commencing about the first of January
and July each year, and being completed in about two
months. Hence there were two assessment lists for
each year. When the chancellor first ordered a ref-
erence in this cause, it was understood that the assess-
ment book for the first half of the year 1876 was
lost, but when the time arrived for taking the account
it was ascertained that all the assessment lists for 1876

and 1877, and for one-half the year 1875, were lost or mislaid and could not be found. The decree of reference had been made on the assumption that none of these lists were lost except for the first half of 1876, and hence some embarrassment arose as to whether the master could state the account on the basis, or substantially on the basis, fixed in the decree of reference. This decree was rendered on February 14, 1884. On May 12, 1884, a further decree was entered, reciting that the loss of said lists as above set out, was made to appear to the court by the affidavit of one of the solicitors of the defendants in the cause, and directing that the master make his report as ordered in the absence of said missing book, if he could do so. The existence of this decree seems to have been overlooked in the subsequent progress of the cause.

One of the main grounds of exceptions to the master's report was, that when he found these books were missing, he should not have attempted to make a report without a further order of the court.

Some of the parties defendant, and especially McCann, before the first appeal to this court, insisted that complainant should produce the missing books; that the presumption was complainant had charge of them, but the chancellor was of opinion that the proof showed said books were lost and could not be found, and this court concurred in this view.

After the cause was heard in this court and remanded, Burns and McCann filed a cross-bill, seeking a discovery of said missing books, and enjoining com-

plainant from proceeding with the account, etc., until said books were produced. On the hearing, the special chancellor, Hon. Thomas H. Malone, was of opinion that the loss of said books had already been adjudicated, and that he had no power to enjoin the execution of the decree of this and the chancery court, unless it was shown that the complainant had fraudulently destroyed, or fraudulently withheld, the missing books, and that the proof fell far short of this, and the chancellor dismissed the bill of Burns and McCann at their cost. This action of the chancellor was manifestly correct. The proof failed to sustain the allegations of the cross-bill, to say nothing of the question whether such a bill could be maintained at that stage of the litigation. The chancellor also proceeded to decree upon the merits of the original cause, and from his decree Burns and McCann prayed an appeal to this court. No other parties appealed from the decree. Burns executed a bond as required, and it is now insisted that the decree of the chancellor is erroneous as to the sureties for his second term of office.

Edwards, as collector, was required to pay over semi-monthly the sums received by him, and to report the amounts so paid over to the council, the receipt of the treasurer to be presented with his report. This report was to set out in detail the various amounts collected by him for the half month, from whom received, etc., and the aggregate thereof. He made such reports, purporting to contain all his collections, and these are not lost, and were used in evidence. Frdy in the year 1879, the city employed R. L. Cain

to take the assessment books of Edwards' terms and make out therefrom a list of the uncollected taxes, or "delinquents," remaining thereon. This he did, this list showing all the credits that Edwards was entitled to as then appeared from said assessment books, except as to the book for the first half of the year 1876, that being then lost. This list is known in the record as the "Cain book," and it also contained, as appears, statements of the amount of taxes that went into Edwards' hands said years—aggregates of the amounts for the years he was in office. The proof shows that this "Cain book" was carefully made out, and that it was a correct statement of what the assessment books showed when it was prepared.

Edwards, as collector, kept receipt books with stubs, and when he gave a receipt for taxes it was his custom to enter upon the stub the date and amount, and by whom paid, as the record indicates. The proof shows that about the last of the year 1877, Edwards became engaged in the business of running a theater, and in 1878 connected himself with a traveling theatrical company, and that from the latter part of 1877, he gave but little personal attention to the business of his office.

When Edwards was first inducted into office, in October, 1874, he received from his predecessor, Glenn, a delinquent tax list, aggregrating $43,616.95. He received his first current assessment list early in 1875.

In this case the chief trouble has been to apportion correctly the defalcation of Edwards among the different sets of sureties. In his first report, the

master states that, with the evidence on file, he can not show accurately the amount that should be charged to each bond, but only approximately. The method he adopted in stating the account was substantially this: He charged each set of securities with the tax aggregates that went into the collector's hands for each respective term, and then credited them by the amount paid over by Edwards for such term, and also by the delinquents, including errors, permits, etc., for that term, as shown by the " Cain book."

Under the city law, Edwards had no way to coerce the payment of these taxes except by shutting off the water from delinquents, and hence the chancellor had decided (and this court approved the ruling) that the collector should be credited by all uncollected taxes. As a result, at the beginning of each new term there was a list of delinquent taxes in the hands of the collector coming from the preceding term or terms, and these delinquent lists he retained and continued to collect from as far as he could. Of course, it follows that the list of delinquents for any one year, as made out by Cain, in February, 1879, as it then stood on the books, would not show accurately the amount of such delinquency as it stood at the end of that year.

When the case was before this court at the last term, the court was of opinion that the actual defalcation for each term could be more accurately ascertained by using, as evidence, the *stubs of the receipt books*, the reports of Edwards referred to, the " Cain book," and the original assessment books, as far as they

14—VOL. 16.

were not lost, with any other evidence that might be obtainable, and comparing these sources of information carefully, etc. But the court adds, in substance, that in the absence of such evidence, the method pursued by the chancery court or the master, "affords, perhaps, the best means of approximating the result."

This court, however, said that the master could not be expected or required to examine these original sources of information, and prepare from them schedules or abstracts to be used as evidence, but that this was the duty of the parties.

On the cause being remanded and again referred to the master, no additional schedules were furnished him, as suggested by this court, except Exhibit A to Glenn's deposition, which will be noticed presently. Each party was allowed to file additional proof. The chancellor was of opinion that no additional proof of any value was presented on the new reference, and in this opinion we concur.

The question presents itself: Whose duty was it to present such additional proof? In trying to ascertain the amount collected during each term, the following plan had been adopted by the court: First, to charge the collector with the amount of the tax aggregates, then to credit him by amounts paid over and by amounts of delinquents. It is not difficult to ascertain the amount of charges, but the contrary is true as to the amount of the credits. The chancellor was of opinion, that the decree of this court meant to put upon the defendants the burden of showing these additional credits, and so ruled. This

conclusion, we think, is fairly to be inferred from said decree. And if this were not so, we would now hold that this is a proper determination of the question. When Edwards received the tax books he was charged with the amount of the same as other collectors are.

It was his duty to make his settlements and procure his credits. Upon a settlement, whatever remained uncollected on the delinquent list he would get credit, for and turn the list over to his successor, and it would make no difference that he was twice his own successor. This would make the necessity of a settlement at the end of each term the more urgent to prevent confusion in his accounts. It was his duty to make these settlements, even if complainant was negligent about it, though the proof shows that complainant attempted to bring him to settlement at least before the books were lost, and at or about the end of his last term. If he failed to make his settlements promptly, as he should have done, his sureties ought to have seen that he complied with the requirements of the law, and that while the proper evidence still existed, to show all just credits as well as charges.

It is insisted by defendants that they should be credited by the $2,575.45, shown by Exhibit A of Glenn's last deposition. This is made up of items and amounts reported by Edwards as collected in 1878, and defendants claim that an examination of the assessment lists of that year shows that they were not collected in 1878, and hence were collected previously.

An examination of this exhibit and the deposition of Mr. Glenn, shows that he proceeded on an erroneous theory; and further, that he has fallen into so many mistakes that the exhibit is of no value. The exhibit contains two classes of cases, and may be a third. In one class there is found on the books of 1878, items of like amount, with the same name, as those appearing on his reports, but not marked *paid* on the book, and witness concludes they are not the same items because not marked paid. But the proof shows that the collector frequently failed to mark an item paid on the book, when it was paid in fact. Take this in connection with the fact that he had his receipt stubs from which to make up his reports, and actually reported these sums collected in 1878, and it shows that the inference drawn by the witness is not sustained by reason. It not appearing what portion of the exhibit is made up of items of this class, it could not be used as evidence, if there was no further objection to it.

It is also insisted that the master, on the basis adopted, failed to credit a sufficient amount for delinquents for the first half of 1876 (the "Cain book" not showing the amount for this half year), by $911.00, or $1,042.12, as the other solicitor makes the amount. It would, perhaps, be sufficient to say, as to this item, and also as to the item of $1,459.89, put down by defendants as "overcharge," that no such exceptions are made to the reports of the master, either the first report or the last report, further than this: One of the parties excepted to the first report on the ground

that the delinquent list for the *last* half of the year 1876 would *naturally* be larger than for the first half; that this would be true in any year, and that therefore a larger credit should have been allowed for the last half of 1876 than for the first half, whereas, the same amount was credited for each half of said year. The reasoning of this exception is probably good, but the exception was filed under a misapprehension of the facts. The fact was, the book was lost for the first half of 1876, and that was the period for which an estimate was made, and the amount of the delinquent list was put down at the same amount as for the last half of 1876. This was in substantial compliance with the mode of estimation suggested in Glenn's deposition, which the chancellor, in the decree of reference, directs to be followed.

As to the item of $1,459.89, there is no such exception to either report of the master. The aggregates as charges, as shown by the "Cain book" were taken from the assessment lists, and that after all additional assessments were added thereto by the collector. Claiborne's books were not taken directly from the assessment lists, and in one instance, at least, he is shown to have made a serious omission in keeping his books. No specific error is pointed out in the evidence used, and it does not appear to have been objected to when first offered to the master and used by him.

Since the cause was remanded no further attention seems to have been given to the stubs of the receipt books. No schedules were presented made from these stubs. Why this was not done does not appear, as

they were entirely ignored by the parties on the last reference and trial.

In that part of the record first brought to this court, there is some intimation, perhaps, that some of these stubs had been lost, but their loss does not seem to have been considered proven by the parties, and the court, under these circumstances, assumed that the stubs could be produced.

As no additional or better evidence was brought before the master on the last reference than he had on the first, he was justified, under the former decree of this court, in stating the account on the proof furnished him. The presumption is, that if there was any better evidence than that already filed known to the parties, they would have produced the same before the master, and it would be useless to again remand the case for an experiment. Under all the circumstances, we do not think a loss should be visited upon complainant because some of the assessment books are lost. The collector did not often mark on these books the dates of his collections, and if the books were accessible the difficulties would not be removed. The proof shows that these books were kept lying about in a room of the city hall, as were other similar books, and there is no sufficient facts disclosed in the record to generate the belief that complainant has suppressed them. It is probable, if these books could be used, that they would increase rather than diminish the amount of the defalcation.

Defendants insist that great injustice has been done them as to the credits for delinquents, because, from Oc-

tober, 1877, to the time when the "Cain book" was made out, collections were still being made from the delinquent list for 1876 and 1877. While this is true, the sureties for the term of 1874–5 can make a like complaint, for in 1876 and 1877, Edwards was still collecting from the delinquent lists of preceding years, and the amount thus collected in 1876 and 1877, was probably as large as the amount collected from 1877 to January 19, 1879, on the delinquent lists, and if so, the sureties for the second term have not been injured by the mode adopted in taking the account.

There is one other fact that tends very strongly to show that the recovery against the complaining defendants is not too large, but less than the real amount of the defalcation. When Edwards first went into office, in October, 1874, he received the Glenn delinquent list, amounting to $43,616 95. By January 1, 1875, he reported collected from this list, $7,811.88. This left a balance of the list of $35,804.97 still in his hands, from which he continued to collect as long as he was in office. Notwithstanding this, the sureties are not charged, or attempted to be, with any part of this delinquent list of $35,804.97, while it is morally certain that Edwards collected a considerable portion of the same.

No interest upon the amounts found due has been charged against defendants. No question has been made here as to the correctness of the decree of the chancellor as to the amount that defendant Burns was entitled to receive of McCann, and the decree is manifestly right on this point.

The decree of the chancellor will be affirmed in all respects. The cost of the appeal will be paid by the apellants.

COOKE, J., dissents.

TURNEY, J., dissents to that part of the opinion relative to the burden of proof.